UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) NOEL HARO, and<br>(2) MARCOS HARO,<br><br>Defendants. | Criminal No. 23-cr-10092-WGY |

**AFFIDAVIT OF FBI TASK FORCE OFFICER MICHAEL RUMERY
IN SUPPORT OF PRE-TRIAL DETENTION**

I, Michael Rumery, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Sergeant with the Massachusetts Department of Correction ("MA DOC") and currently assigned to the Federal Bureau of Investigation ("FBI") and the New England Organized Crime Drug Enforcement Task Force ("OCDETF").

2.  I have been a Correction Officer, serving full-time with the MA DOC from 2005 to present. Since 2014, I have been in the Investigations Unit for the MA DOC. Since August 2018, I have been assigned as a Task Force Officer ("TFO"), defined as a sworn Special Federal Officer, with the FBI. I am an investigative or law enforcement officer of the United States and authorized to exercise the powers of enforcement personnel set forth in 21 U.S.C § 878. I am deputized pursuant to Title 28, Federal Code of Regulations, sections 0.112 and 0.19A, and I am charged with the duty of investigating violations of the laws of the United States as stated in Title 28, Federal Code of Regulations by order of the Attorney General of the United States.

3.  I have received training from the New England State Police Information Network ("NESPIN") and the MA DOC in (among other things) basic narcotic investigations, drug identification, drug detection, interdiction, familiarization with narcotic laws, identification and

seizure of drug related assets, organized crime investigations, and physical and electronic surveillance techniques.

4.    My primary duties as an FBI TFO include the investigation of organized narcotic traffickers, narcotic distribution and money laundering offenses, and other federal and state crimes. I have participated in numerous arrests for both state and federal law violations, seizures of large quantities of controlled substances, physical and electronic surveillance, the execution of search warrants, and debriefing of informants. In conjunction with other federal law-enforcement agencies I have participated in investigations of large scale national and international drug trafficking organizations. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. Based on my training and experience, I am familiar with the vernacular used by consumers and distributors of illegal narcotics. I have observed numerous types of controlled substances and I am familiar with the packaging, pricing structure, distribution methods, and street jargon associated with their sale and use.

5.    Based on my training and experience, I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and coconspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers. Consequently, the location of drug traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

6.    Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics

and to collect, expend, account for, transport, and launder drug proceeds.

7. Based on my training and experience, I am familiar with the vernacular used by consumers and distributors of illegal narcotics. I have observed numerous types of controlled substances and I am familiar with the packaging, pricing structure, distribution methods, and street jargon associated with their sale and use. I have also encountered and become familiar with the various tools, methods, trends, and paraphernalia used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.

## PURPOSE OF AFFIDAVIT

8. I make this affidavit in support of the pre-trial detention of defendants (1) Noel Haro (hereinafter, "NOEL") and (2) Marcos Haro (hereinafter, "MARCOS") (collectively, the "Defendants"). The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting pre-trial detention of the Defendants, and does not set forth all of my knowledge about this matter.

## BACKGROUND OF THE INVESTIGATION

9. In or about March 2019, MA DOC investigators initiated an investigation into NOEL, who is currently housed at a MA DOC facility, where he is serving a life sentence in connection with convictions in Arizona for drug distribution, conspiracy, and money laundering. NOEL was transferred to serve his sentence in a Massachusetts facility because he was deemed a "security concern" in Arizona, both due to his influence over other inmates and his repeated introduction of cell phones and narcotics into Arizona facilities. NOEL is a member and influential leader of the gang the "Border Brothers," which is a large-scale international gang with a presence in Nogales, Mexico; Southern Arizona; and the Arizona prison system. The Border Brothers are

known by law enforcement to be heavily involved in drug, weapon, and human trafficking in Southern Arizona.

10. In the course of monitoring NOEL's inmate telephone calls, investigators learned that NOEL attempted to solicit friends and family members to transport narcotics from Arizona to Massachusetts on his behalf.

11. In or about April 2019, FBI Boston initiated a federal investigation into NOEL and his attempts to facilitate the trafficking of narcotics to Massachusetts. As part of that investigation, law enforcement continued to monitor NOEL's recorded inmate calls. Throughout the remainder of 2019 and through August of 2020, investigators continued to monitor NOEL's MA DOC inmate telephone calls. The calls consistently indicated that NOEL was attempting to solicit different civilians to travel to Arizona to collect contraband and/or narcotics and transport them back to Massachusetts. In August 2020, the FBI closed its investigation, however, the MA DOC continued to monitor NOEL for illicit activity.

12. In April 2022, MA DOC investigators notified FBI Boston that, based on recorded inmate calls, investigators believed that NOEL instructed others to travel to Arizona to meet with individuals yet to be identified to retrieve narcotics to transport back to Massachusetts. Based on that reporting, the investigators re-opened the FBI Boston investigation into NOEL.

13. Also in April 2022, recorded inmate calls indicated that NOEL worked with his brother MARCOS to arrange drug deals outside of prison. MARCOS resides in Sacramento, California and has a criminal history that includes a conviction in 2016 for possession of a controlled substance while armed and illegal possession of an assault weapon with a large capacity magazine, for which he was sentenced to 7 years' imprisonment. His criminal history includes another firearm conviction, a stalking conviction, as well as multiple arrests for robbery, domestic

assault, and intimidation of a witness and stalking. MARCOS is a known member of the Norteno gang, which is a Mexican American gang located in Northern California, as well as the RideZilla prison gang.

### Controlled Purchases

14. In June 2022, recorded inmate calls indicated that NOEL was working with MARCOS to arrange to have MARCOS supply drug customers with various narcotics. At the direction of agents, a cooperating witness (hereinafter, the "CW") contacted MARCOS via telephone to discuss MARCOS supplying the CW with various narcotics. The communications between the CW and MARCOS were recorded.

15. On June 29, 2022, during one such recorded communication, MARCOS agreed to provide the CW with samples of the multiple different narcotics that MARCOS was able to supply. The same day, MARCOS and NOEL spoke over a recorded inmate call about MARCOS setting up the deal with the CW. MARCOS confirmed to NOEL that he had spoken to the CW, and NOEL and MARCOS discussed how much MARCOS should charge the CW for a pound of methamphetamine, as well as how much they should charge the CW for fentanyl pills.

16. On July 5, 2022, MARCOS informed the CW that he would be "sending something out tomorrow by 4pm." The CW sent MARCOS a text message in which the CW provided MARCOS with the address for MARCOS to mail the narcotics. The address provided by the CW was actually a mailbox controlled by the FBI.

17. On July 11, 2022, MARCOS sent the CW received a text message with photographs of a purple teddy bear and a United States Postal shipping envelope. MARCOS also sent text messages to the CW in which he told the CW that he was on his way to the post office. Later that day, MARCOS sent the CW a text message with a photograph of a receipt from the United States

Postal Service that included a parcel tracking number, which the CW subsequently provided to investigators.

18. On July 13, 2022, investigators retrieved a package from the FBI controlled mailbox. Located inside the package was a purple teddy bear containing approximately 2.8 grams of an off white powder that field tested positive for fentanyl, five blue pills marked "30" suspected to be fentanyl, a of crystal like substance that field tested positive for methamphetamine, and approximately 3.1 grams of a black tar like substance suspected to be heroin. Laboratory analysis confirmed the five pills to be approximately 0.532 grams of fentanyl and the suspected methamphetamine to be approximately 12.7 grams of 96% pure methamphetamine.

19. On July 14, 2022, the CW sent a text message to MARCOS letting him know that the CW had received the package. The CW also asked MARCOS "is that black T?" (meaning black tar heroin) and MARCOS replied "Tar" and "Yup." MARCOS then informed the CW that the total cost of the sample was $500 and instructed the CW to send payment via a CashApp, a peer-to-peer payment application.

### **MARCOS Sent the CW One Pound of Methamphetamine**

20. From July 20, 2022 to July 25, 2022, at the direction of investigators, the CW contacted MARCOS to make arrangements for MARCOS to ship one (1) pound of methamphetamine to the CW. During the recorded calls, MARCOS told the CW that a pound of methamphetamine would cost $5,000. On July 25, 2022, NOEL and MARCOS discussed this transaction during a recorded inmate call, and discussed that MARCOS would charge the CW "5" meaning $5,000 for a pound of methamphetamine. The same day, MARCOS sent the CW a text message that had a photograph of a white box addressed to the same FBI controlled mailbox address previously provided by the CW to MARCOS, as well as a photograph of a United States

Postal Service receipt that included a parcel tracking number. On July 27, 2022, investigators retrieved that package from the FBI controlled mailbox. Inside of that package, investigators found a white crystal like substance that field tested positive for methamphetamine. Laboratory analysis confirmed the substance to be approximately 446.6 grams of 99% pure methamphetamine.

### MARCOS Sent the CW Five Pounds of Methamphetamine

21.     On August 10, 2022, a during recorded inmate call, NOEL asked MARCOS if he had spoken with the CW, and MARCOS said he had not. NOEL then told MARCOS that he needed to get in touch with the CW and that the CW wanted "five glasses of water" (meaning five pounds of methamphetamine). NOEL directed MARCOS to make sure that he could get that amount before he agreed to the deal with the CW.

22.     In September 2022, at the direction of investigators, the CW contacted MARCOS to arrange another controlled purchase. The communications were consensually recorded. On September 7, 2022, MARCOS sent the CW five (5) pounds of methamphetamine. That day, MARCOS sent the CW a text message containing a photograph of two receipts from the United States Postal Service that included the tracking numbers for two packages. On September 12, 2022, investigators retrieved two packages from the FBI controlled mailbox that matched tracking numbers sent to the CW by MARCOS. Inside of those packages, investigators found a crystal like substance that field tested positive for methamphetamine. Laboratory analysis confirmed the substance in one of the packages to be approximately 892.3 grams of 86% pure methamphetamine, and the substance in the other package to be approximately 1,320.2 grams of 95% pure methamphetamine.

### MARCOS sent the CW Over 200 grams of Fentanyl Pills

23.     In October and November 2022, at the direction of agents, the CW communicated

with MARCOS to arrange for him to ship the CW 2,000 fentanyl pills. During one call, MARCOS asked CW about timing of when he wanted the shipment noting that he did not want to keep the drugs at his house, stating, "I just wanted to know how long exactly cause I don't want it to be sitting at the house with the kids and shit, you know."

24. On October 16, 2022, during a recorded inmate call, NOEL and MARCOS discussed MARCOS sending the CW 1,000 to 2,000 fentanyl pills, which they referred to as "1-2 sheets" of "diamonds." During the call, they discussed how much MARCOS should charge the CW, and NOEL told MARCOS to charge the CW "3" meaning $3 per pill.

25. On October 26, 2022, at the direction of investigators, the CW conducted consensually recorded communications with MARCOS to discuss MARCOS supplying the CW with fentanyl pills. MARCOS told the CW that he recently had the "ones that are a bunch of different colors" and that he would check to see what was available and contact the CW to arrange for the shipment.

26. On November 3, 2022, the CW spoke with MARCOS and MARCOS told the CW that he would sell the fentanyl pills for $2.50 per pill. MARCOS then asked the CW, "Do you have a timeframe?" and "I'm asking because I can go pick up everything today, but I have kids so I don't want to sit on that." Based on my training and experience and involvement in this investigation, I believe that when MARCOS asked if the CW had a "timeframe" and that when MARCOS said that he did not want to "sit on that," he was asking when the CW would be ready to complete the deal, so that he would then go to his source of supply to get the fentanyl pills, because he did not want to be in possession of the fentanyl pills for longer than necessary.

27. On November 8, 2022, the CW contacted MARCOS via telephone. During the call, MARCOS told the CW, "I've just been waiting on you" and "I just wanted to know how long

exactly cause I don't want it to be sitting at the house with the kids and shit, you know."

28.   On November 16, 2022, the CW contacted via telephone. During the call, MARCOS and the CW discussed finalized prices of fentanyl pills and agreed that the CW would pay MARCOS with $5,000 in exchange for 2,000 fentanyl pills.

29.   On November 17, 2022, MARCOS sent the CW a photograph of a United States Postal Service shipping box and label, and a photograph of a receipt from a USPS store located at 10923 Progress Ct, Rancho Cordova, California. Based on those messages, investigators believe that MARCOS shipped the CW a package containing fentanyl pills.

30.   On November 20, 2022, investigators seized a package from the FBI controlled mailbox that matched the tracking numbers contained in the photograph of the receipt sent by MARCOS to the CW. Inside that package investigators discovered approximately 2,000 blue pills marked "M" and "30." Laboratory analysis confirmed the pills to be approximately 215.3 grams of fentanyl.

## MARCOS Arrest

31.   On April 2, 2023, MARCOS was arrested by the Sacramento Police Department in Sacramento, California in connection with a motor vehicle stop. According to the police report, at approximately 4 p.m. on April 2, 2023, officers were conducting a routine patrol in the Del Paso Heights area, which had been having issues with armed subjects, as well as multiple gang shootings and homicides. Officers observed a vehicle fail to stop at an intersection and they performed a traffic stop. Officers identified MARCOS as the driver, and determined that he did not have a valid license to drive. During a subsequent search of the vehicle, officers seized a 9mm handgun with 8 live rounds in the magazine, and approximately 2.9 grams of suspected fentanyl that field tested positive for the presence of opiates. Thereafter, MARCOS was charged with state drug and

firearm offenses. MARCOS was released on bail, and those charges remain pending.

## CONCLUSION

32.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to present facts supporting the pre-trial detention of Noel Haro and Marcos Haro, and does not set forth all of my knowledge about this matter.

Signed under pains and penalties of perjury this 7th day of April 2023.

_____
Michael Rumery, Task Force Officer
Federal Bureau of Investigation